**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALAN D. DIEDE and MARY ANN P. HUK**, | ) | Civil Action No. 06-1073 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Lancaster |
| v. | ) | |
| | ) | |
| **CITY OF McKEESPORT** and the | ) | Magistrate Judge Lenihan |
| **McKEESPORT POLICE DEPARTMENT**, | ) | |
| | ) | |
| | ) | Doc. No. 35 |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

I.      RECOMMENDATION

It is respectfully recommended that Defendants' Motion for Summary Judgment at Doc. No. 35 be denied in part and granted in part.  It should be denied only as it relates to Plaintiffs' Fourteenth Amendment Procedural Due Process claim regarding the removal of their vehicle.  In all other respects, Defendants' Motion for Summary Judgment should be granted.

II.      REPORT

A.      Facts

The following facts are undisputed unless otherwise indicated.  (Doc. Nos. 36 & 39.)[1]

Plaintiffs Alan Diede ("Diede") and Mary Ann Huk ("Huk"), husband and wife, filed this

---

[1] At Doc. No. 39, Plaintiffs state that they "will not dispute Defendant's concise statement of undisputed fact except for [certain numbered paragraphs specifically listed].  Consequently, the facts submitted by Defendants in their Concise Statement of Undisputed Material Facts at Doc. No. 36 are deemed admitted unless disputed by Plaintiffs at Document No. 39.  See Local Rule 56.1 E.

lawsuit alleging that the City of McKeesport ("City") and the City of McKeesport Police Department ("Police Department") violated their civil rights when the nineteenth century barn on their property at 631 Shaw Avenue, McKeesport, Pennsylvania was razed, and their 1978 Mustang was removed from their property[2]. Plaintiffs claim that the City and its Police Department violated their Fourteenth Amendment procedural and substantive due process rights when they razed the barn and removed the vehicle without providing a predeprivation hearing. Plaintiffs further claim that the razing of their barn and removal of the vehicle were in retaliation for Huk's protected speech at City meetings and other activities related to her efforts to preserve historical structures in the City. Plaintiffs also allege that their Fifth Amendment right to be free from government takings was violated, and that Defendants conspired to violate their civil rights. Plaintiffs seek compensatory damages for the value of the barn (which they characterize as a historic stable), the value to reconstruct the barn, to repair their yard, and for stress, sickness and anxiety, along with punitive damages, costs and attorneys fees.

Plaintiffs contend that Huk's historical preservation activities began in the 1990s when she became involved with historical preservation in the McKeesport/Mon Valley area. Huk alleges that she started a historical society and worked with different individuals to have certain historical locations marked, was active in communicating with community leaders, and routinely spoke at City Council meetings beginning in 1993[3].

---

[2]Plaintiffs aver that the structure in issue was a horse stable dating back to 1865. (Doc. No. 1 at ¶¶ 10-11.) It is referred to by a variety of descriptors throughout the record including horse stable, carriage stable, shed, and barn. For consistency, the structure will be referred to herein as "the barn."

[3]Huk admits that she can only recall speaking at one City meeting pertaining to demolition of an alleged historical structure; this meeting occurred on October 4, 2005 and

Huk alleges that in 1997, she was involved in an effort to redevelop Shaw Avenue in McKeesport, which included meeting with former Mayor Bendel, Jody Swenderman, the Activities Director, and Dennis Pittman, the Community Development Director.  The parties dispute whether Pittman participated in the alleged 1997 meeting about the Shaw Avenue redevelopment.  The parties also dispute whether Mayor Bendel, and/or Swenderman were involved in the decision to raze Plaintiff's barn or remove the vehicle.[4]

On February 19, 2001, Plaintiffs were issued a citation by Scott Joseph, the former City Code Inspector for the unsafe condition of the barn.  Upon receipt of the letter, Plaintiffs contacted Joseph and advised that they were fixing the barn.  The record reflects that on February 22, 2001, Plaintiffs evaluated the barn and provided an estimate for conservation.  The record does not reflect that Plaintiffs made any improvements to the barn between this date and November 18, 2005, other than securing a tarp over the barn in February 2002.

Huk claims that in 2001, Pittman refused her proposal to place street lights in the City's historic districts.  Pittman testified that he had no recollection of a conversation with Huk about a proposal to replace streetlights.

On January 17, 2002, Plaintiffs received citations from the City of McKeesport for failure

_____

concerned the demolition of the Penn McKee hotel.

[4]Defendants note that Mayor Bendel died in 2003, 2 years prior to the razing of Plaintiffs' barn, and Swenderman resigned her employment from the City in February 2000. Plaintiffs, however, state that on November 20, 1997, Huk requested information from Swenderman that was never provided, and that in May 1998, the historical society formed by Huk sent complaint letters to Mayor Bendel.  Huk also alleges that she requested that Shelia Brown, an assistant in the Community Development department of the City, provide her with information regarding demolitions which occurred in the City and were conducted with federal funds.  Plaintiffs, however, admit that Brown had no involvement in the decision to raze the property or remove the vehicle.  (Doc. No. 39 at 1-2.)

3

to fix or demolish an unsafe and dilapidated garage.  Plaintiffs were found guilty of the violations at the magistrate level.  Plaintiffs appealed.  At the county common pleas court level, the magistrate's ruling was reversed due to procedural error.  Christopher House was the new code inspector at that time.  The parties dispute whether House was upset by the fact that the case was dismissed and whether he was reprimanded by the City; Plaintiffs assert that House admitted that he was "berated" by Judge Gallo in the county court of common pleas when all charges were dismissed.  Plaintiffs citations to the record on this point, however, do not support this assertion.  See Doc. No. 39-3 at 5, 8.  Plaintiffs aver in their Complaint that the court held that Plaintiffs were denied due process.  (Doc. No. 1 at ¶ 58.)  Again, the record does not substantiate this averment.

The parties also dispute whether between February 2001 and April 2004, Plaintiffs performed work on the barn.  Defendants contend that Plaintiffs did not; Plaintiffs describe the following improvements: 1) In 1999, Plaintiffs erected five (5) wood support columns inside the barn; 2) On February 22, 2001, after their first citation for the unsafe condition of the barn, Plaintiffs evaluated the barn and provided an estimate for conservation; 3) On February 20, 2002, Plaintiffs secured a tarp over the barn; and 4) in 2007, Plaintiffs secured an estimate of repair.

On April 20, 2004, Plaintiffs received another warning about the dilapidated condition of the barn.  The record does not reflect that improvements were made between this date and November 18, 2005.

On August 3, 2005, James Garvin, P.E. of Senate Engineering performed a visual inspection of the Plaintiffs' barn at the City's request.  Garvin's report opined the following:

4

**Observations**

A very large portion of the wood-framed roof has collapsed and fallen into the building.  Other portions of the roof, that are still standing, do not appear to be structurally stable, due to damage caused by the portion already collapsed.  This damage is severe enough that entry into the building should be prohibited.  The structure is leaning and appears to be nearing collapse.  Proximity of the structure to the City's street right-of-way, poses a significant public health hazard due to the potential for falling debris to fall onto the City's roadway.

**Recommendations**

It is my (James S. Garvin, Jr., PE) professional opinion that this structure poses a significant health hazard and that immediate demolition is suggested.

Huk alleges that she attended a Property Maintenance Code Appeals Board hearing on October 4, 2005 and spoke on behalf of the Pennsylvania Historic and Museum Commission against demolishing the Penn McKee Hotel in McKeesport, and that current Mayor Jim Brewster, House, Solicitor Jason Elash, Pittman, Police Chief Pero, and Fire Chief Lust were present.  At this meeting, Huk asked the Board not to condemn and tear down the Penn McKee Hotel.  She testified that the only response she received at the meeting was a recitation of the code violations of the hotel.  Huk alleges that Solicitor Elash asked her what she planned to do with her barn to which she replied that it took money to restore it.  The parties dispute whether Elash was involved in the decision to raze the barn or remove the vehicle.

On November 18, 2005, the City received another complaint about the Plaintiffs' barn.  On that same day, House wrote a letter to Plaintiffs declaring the barn was condemned due to violations of City ordinances.  He provided an appeal period.  Thereafter, House performed a visual inspection of the barn and took photographs.  The parties dispute what occurred next.  Defendants state that Huk came out of her house and Code Inspector House told her that the structure was ready to fall down, and Huk disagreed.  House then drove away.  Plaintiffs state that House came to Plaintiffs' home during the day and insisted that the "barn" is "coming

down."  Huk said it was not coming down.  Plaintiff asserts that House angrily left without

examining the barn, and said, "we'll see about that!"

The parties agree that after House left the property, he sought out Fire Chief Lust to

discuss the condition of the barn.  House believed that the barn appeared to have collapsed

further, and that it appeared to be seriously leaning far worse than it had previously.  In addition,

the weather was very windy that day.  House told Lust that he felt that the barn had worsened in

its structural instability and that it warranted an emergency measure.  Lust told House that he

wanted to look at the structure himself.  Later that evening House and Lust performed a visual

inspection of the barn.  House and Lust discussed what action to take and agreed that the barn

should be immediately torn down because it posed a serious hazard.  Police Chief Pero also

expressed his extreme concern because the structure was abutted to a sidewalk of a street that is

a bus route and a public through-way.  Pero stated that the City was seriously endangering

people by not doing anything.

Dennis Pittman was privy to the discussion regarding the razing of the barn but did not

offer any technical advice.  Pittman believed, but was not certain, that Nick Shermeti, the Public

Works Director, was also involved in the decision to raze.  Pittman testified that Lust, House,

and Shermeti were of the opinion that the barn would not last until Monday morning and should

be knocked down.  Pittman authorized the use of either a contractor or overtime for the public

works department.  Pittman left the scene after providing such authorization.  No discussion

among the City officials occurred regarding Huk's involvement in historical activities.  House

testified that he had no reason to recall Huk's speech at the October 4, 2005 hearing regarding

the demolition of the Penn McKee hotel when the barn was razed.  House testified that his only

concern at the time of the razing was public safety.  Plaintiffs dispute this statement and believe that their barn was razed as a result of retaliation.

While on the scene, City officials found a 1978 Mustang with expired registration and inspection sticker.  The vehicle's tires were flat, its entire body was rusted, and it was leaking oil.  (Doc. No. 37-12 at 2.)  The vehicle was towed from the property; police shift commander Lieutenant Dixon ordered that the vehicle be towed because it was leaking oil, and thus posed a hazard.  Plaintiffs dispute that this was the real reason why the vehicle was towed, and that whether the vehicle posed a hazard was merely an opinion.  Officer Sydney Summers towed the vehicle with the approval of Lieutenant Dixon.  Police Chief Pero testified that he did not know Plaintiffs, or of Huk's involvement in historical preservation.  No record evidence suggests that Summers or Dixon knew Plaintiffs or knew of Huk's involvement in historical preservation. Pero had no recollection of Plaintiffs attempting to recover the vehicle.

After the decision was made to raze the barn, the Public Works Director called a high-lift operator and the police and fire departments blocked off the street.  Upon arrival, the high-lift razed the barn, pushing the debris away from the sidewalk.

On November 18, 2005, the City had the following ordinances in place:

BOCA PM-109.1 Imminent Danger:

> When, in the opinion of the code official, there is imminent danger of failure or collapse of a building or structure which endangers life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the structure, or when there is actual or potential danger to the building occupants or those in the proximity of any structure because of explosives, explosive fumes or vapors or the presence of toxic fumes, gases or materials, or operation of defective or dangerous equipment, the code official is hereby authorized and empowered to order and require the occupants to vacate the premises forthwith. The code official shall cause to be posted at each entrance to such structure a notice reading as follows: "This structure is Unsafe and its Occupancy has been

Prohibited by the Code Official." It shall be unlawful for any person to enter such structure except for the purpose of securing the structure, making the required repairs, removing the hazardous condition, or of demolishing the same.

PM 109.2 Temporary Safeguards

Notwithstanding other provisions of this code, whenever, in the opinion of the code official, there is imminent danger due to an unsafe condition, the code official shall order the necessary work to be done, including the boarding-up of openings, to render such structure temporarily safe whether or not the legal procedure herein described has been instituted; and shall cause such other action to be taken as the code official deems necessary to meet such emergency.

PM 109.4 Emergency Repairs

For the purposes of this section, the code official shall employ the necessary labor and materials to perform the required work as expeditiously as possible.

PM 108.1.3 Structures Unfit for Human Habitation

All buildings or structures which are structurally unsafe or not provided with adequate egress, or which constitute a fire hazard, or are otherwise dangerous, or which in relation to existing use constitute a hazard to safety or health, or public welfare, by reason of inadequate maintenance, dilapidation, obsolescence, fire hazard, or abandonment, as specified in the Code or any other effective ordinance, are, for the purpose of this Section, unsafe buildings. All such unsafe buildings are hereby declared to be public nuisances and shall be abated by repair, rehabilitation, demolition, or removal in accordance with the procedure specified in the code.

On January 1, 2006, Plaintiffs received a letter from the Department of Transportation advising that they had thirty days to claim their vehicle or it would be deemed abandoned. Diede testified that he contacted the City to determine the whereabouts of his vehicle, and was told that it was at C&D Towing.

Huk does not dispute that her First Amendment retaliation claim rests solely upon her own beliefs. Further, Diede does not dispute that his belief that the City's actions were retaliatory is based upon his own "logical conclusions."

Plaintiffs do not dispute that they never contacted the City about the razing of the barn and did not request an appeal hearing.

The City also had the following ordinances in place on November 18, 2005:

BOCA PM-109.6 Hearing

> Any _person_ ordered to take emergency measures shall comply with such order forthwith.  Any affected _person_ shall thereafter, upon petition directed to the appeals board, be afforded a hearing as described in this code.

McKeesport amended PM 111.2 "Membership of Board" to read as follows:

> The City of McKeesport, Code Appeals Board, established and provided for, shall act with respect to the provisions of the Existing Structures Code.  If any person shall be aggrieved or in dispute with any employee or office of the City of McKeesport's Community Development Code Enforcement Program involving any matter in connection with Existing Structures code, such person, shall request, in writing, a hearing by the Code Appeals Board, which Board shall conduct a hearing and shall arrive at a decision.

> If either party to said dispute still is dissatisfied an appeal in writing then may be filed with the Court of Common Pleas, Allegheny County which shall then finally determine the dispute.  No person shall request the determination of any dispute on any matter concerning the Existing Structures Code without first having appealed the question to the Code Appeals Board.

B.      Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact; that is, the movant must show that the evidence of record is insufficient to carry the non-

movant's burden of proof.  Id.  Once that burden has been met, the nonmoving party must set

forth "specific facts showing that there is a genuine issue for trial" or the factual record will be

taken as presented by the moving party and judgment will be entered as a matter of law.

Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R.

Civ. P. 56(e)) (emphasis added by Matsushita Court).  An issue is genuine only "if the evidence

is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v.

Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).  In Anderson, the United States Supreme Court

noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the
> evidence and determine the truth of the matter but to determine whether there is a
> genuine issue for trial. . . .  [T]here is no issue for trial unless there is sufficient
> evidence favoring the nonmoving party for a jury to return a verdict for that party.
> If the evidence is merely colorable, or is not significantly probative, summary
> judgment may be granted.

Id. at 249-50 (internal citations omitted).  While any evidence used to support a motion for

summary judgment must be admissible, it is not necessary for it to be in admissible form.  See

Fed. R. Civ. P. 56 (e); Celotex Corp., 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc.,

909 F.2d 1524, 1542 (3d Cir. 1990).  The non-movant cannot rely solely on unsupported

assertions or conclusory allegations.  Anderson, 477 U.S. at 249.

Here, Defendants contend that they are entitled to judgment as a matter of law on all of

Plaintiffs' claims and argue the following: 1) Plaintiffs' Fourteenth Amendment Procedural Due

Process claim must be dismissed because the barn was in imminent danger of collapse and a

public safety hazard, and the Plaintiffs failed to avail themselves of the available post-

deprivation hearing process; 2) Plaintiffs Fourteenth Amendment Procedural Due Process claim

regarding the removal of their vehicle must be dismissed because Plaintiffs had an adequate post

deprivation remedy; 3) Plaintiff Huk's First Amendment retaliation claim must be dismissed

because there is no causal connection between her alleged protected speech and the razing of the

barn; and 4) Plaintiffs' Fourteenth Amendment Substantive Due Process claim must be

dismissed because the government action cannot be considered "arbitrary, conscience-shocking,

or oppressive" as a matter of law.

Plaintiffs respond as follows: 1) there were no facts to support that their barn was in

imminent danger of collapse and/or a public safety hazard on November 18, 2005; 2) a genuine

issue of material fact exists regarding the condition of the automobile and whether Plaintiffs

requested a post-deprivation hearing that was not provided; 3) there is clear circumstantial

evidence of retaliation; 4) the specific facts and circumstances surrounding the razing of

Plaintiffs' barn, and the Defendants' history of depriving Plaintiffs of their procedural due

process rights "shocks the conscience," and 4) Plaintiffs do not contest the dismissal of their

conspiracy claim, claims against the police department as an entity not subject to suit pursuant to

§ 1983, their Fifth Amendment taking claim, and their claim for punitive damages against the

City.


C.    <u>Analysis</u>

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage of any State or Territory or the District of Columbia, subjects, or

causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  Thus, to state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under the color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States.  Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

1.       Fourteenth Amendment Procedural Due Process Claims

a.       The Barn

The Fourteenth Amendment to the United States Constitution prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law . . .."  U.S. Const. amend. XIV, § 1.  A court employs a two step analysis when a plaintiff files an action pursuant to § 1983 for a state actor's failure to provide procedural due process: 1) whether the asserted interests fall under the Fourteenth Amendment's protections of "life, liberty, or property;" and if so, 2) whether the procedures available provided plaintiff with "due process of law."  Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984).  Defendants do not contest that a property interest protected by the procedural component of the due process clause is at issue here.  Therefore, the only issue presently before the Court is whether "due process of law" was provided.

Like the parties, the Court is guided by the recent United States Court of Appeals' opinion in Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412 (3d Cir. 2008).  In

<u>Elsmere Park</u>, the Third Circuit discussed a basic element of procedural due process as follows:

> A fundamental requirement of due process is the opportunity to be heard.  That opportunity must be granted at a meaningful time and in a meaningful manner.  In the typical situation, the hearing should come before the Government deprives a person of his property.  This makes practical sense, for when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented.
>
> Nonetheless, the Supreme Court has held that, in special circumstances, a state may satisfy the requirements of procedural due process merely by making available some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.  Where there is the necessity of quick action by the State, or where providing any meaningful predeprivation process would be impractical, the Government is relieved of the usual obligation to provide a predeprivation hearing.

<u>Elsmere Park</u>, 542 F.3d at 417 (internal quotations and citations omitted).

The facts in <u>Elsmere Park</u> are similar to the facts in the case at bar.  In <u>Elsmere Park</u>, the Town condemned a complex of thirty-nine apartment buildings without a predeprivation hearing. <u>Id</u> at 414.  The complex contained a total of 156 apartments, including one basement unit in each of the thirty-nine buildings.  The Town prohibited the rental of the basement units after severe flooding occurred from Hurricane Hugo, but permitted continued use of the above-ground units. The basement apartments were boarded up with plywood, and later, the basement windows were bricked over to seal the basement apartments.  <u>Id</u>. at 414-15.  Several years later, while conducting a routine inspection of the apartments, the Town's Code Inspector detected a strong smell of mold.  Subsequently, the Inspector, and a representative from the Delaware Department of Public Health inspected two basement units and found mold, water leaks, and raw sewage. Thereafter, the two sought the advice of the Chief Toxicologist for the state of Delaware who concluded that the basement conditions posed a serious health threat to the apartment residents.

13

Upon recommendation of the Chief Toxicologist and the Delaware Public Health Department, and upon inspection of all the buildings within a matter of days, the Town immediately condemned the buildings and vacated the residents.  Id. at 415.  The occupied apartments above the basements were never inspected.  Id. at 415.  Likewise, air samples from the occupied apartments were never taken by any of the investigators, nor did the record reflect that any residents actually complained of, or suffered from mold-related illness or other mold-related conditions in their apartments.  Id. at 416.  Although the owner of the apartments initially sought a post-deprivation hearing, it later abandoned its administrative appeal.  Id. at 416.

The United States Court of Appeals for the Third Circuit held that the Town's condemnation of all the apartment buildings without a predeprivation hearing did not violate procedural due process.  Specifically, the Court emphasized that "summary administrative action may be justified in emergency situations."  Id. at 417 (quoting Hodel v. Va. Surface Mining & Recl. Ass'n, 452 U.S. 264, 300 (1981)).  The court adopted the test from the Second Circuit Court of Appeals that "where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist . . . [,] the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."  Id. at 418 (quoting Cantanzaro v. Weiden, 188 F.3d 56, 63 (2d Cir. 1999)).  Consequently, the court considered whether there was "competent evidence" to support a reasonable belief that the mold situation presented an "emergency," and whether the Town's actions were otherwise "arbitrary" or an "abuse of discretion."  Id.  In concluding that the Town's failure to provide a predeprivation hearing did not amount to a constitutional violation, the court considered the following undisputed facts: 1) the sealed off basement apartments were

14

overrun with mold; and 2) the Town Code Inspector consulted several state experts who indicated that "the mold potentially posed a substantial and immediate threat to the health and welfare of the Apartments' residents."  Id. at 419.  In light of the undisputed facts, the court indicated that the Town did not act unreasonably in condemning the property without a predeprivation hearing.  Moreover, the court commented upon the less than comprehensive investigation of the mold situation in that none of the occupied units was inspected to determine whether the mold had indeed spread up from the basements.  Significantly, the court stated that "[w]here government officials are faced with a situation in which a failure to act quickly could have serious health consequences, perfection or near perfection is not the standard."  Id. at 419-20.  Hence, the Third Circuit Court of Appeals concluded that in light of the undisputed evidence of the mold problem, and the Town's reliance on the advice of experts, the Town's actions were neither arbitrary nor an abuse of discretion.  Consequently, the court held that due process did not require a predeprivation hearing under these circumstances.  Id. at 420.

Next, the court considered whether the Town provided an adequate postdeprivation remedy.  Even where an emergency situation exists, the court noted the necessity of the government to make available "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking" in order to "satisfy the requirements of procedural due process."  Id. at 420 (quoting Parratt v. Taylor, 451 U.S. 527, 539 (1981)).  If an adequate postdeprivation remedy exists, the owner of the apartments must have availed itself of the remedy.  After an analysis of the Code provisions in place, the court concluded that the Town did provide the owner with adequate means for appealing the condemnations.  Id. at 420-23.  Next, the court noted that the owner had conceded that it failed to take advantage of the available

remedy, emphasizing its previous holding that '[i]n order to state a claim for failure to provide

due process, a plaintiff must have taken advantage of the processes that are available to him or

her, unless those processes are unavailable or patently inadequate." Id. at 423 (quoting Alvin v.

Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)).  Hence, the court concluded that the owner of the

apartments could not claim a constitutional injury.  Id. at 423.

      Here, too, there was "competent evidence" to support a reasonable belief on behalf of the

Defendants that the barn posed an emergency situation.  The record is clear that on August 3,

2005, James Garvin, P.E. of Senate Engineering performed a visual inspection of Plaintiffs' barn

and found that entry into the barn should be prohibited due to its structural instability.  He noted

that a very large portion of the wood framed roof had collapsed and fallen into the building.

Further, he indicated that the proximity of the barn to the "City's street right-of-way, pose[d] a

significant public hazard due to the potential for falling debris to fall onto the City's roadway."

Garvin also opined that the barn posed a "significant health hazard and that immediate

demolition" was warranted.

      It is also undisputed that Christopher House, the building inspector and zoning officer for

the City since 2002, and Fire Chief Lust performed a visual inspection of the barn late in the day

on November 18, 2005.  House believed that the barn had collapsed further since his last

examination, and appeared to be seriously leaning far worse than it had previously.  He also

noted that it was very windy on this particular day.  Upon visual inspection that evening, House

and Lust agreed that the barn should be torn down because it posed a serious hazard.  Police

Chief Pero was also consulted.  Pero indicated that he was extremely concerned because the

structure abutted a street sidewalk on a bus route and  public through-way.  Pero stated that the

City was endangering people by not doing anything.  Based upon these undisputed facts of record, the City's invocation of emergency procedures to raze the barn was neither arbitrary nor an abuse of discretion.[5]  Consequently, the City did not act unreasonably in razing the barn without a predeprivation hearing.

Plaintiffs argue that the razing of the barn was the result of the uneducated opinion of Christopher House, based upon "his neglectful exterior inspection" of the barn.  (Doc. No. 39 at 3.)  Plaintiffs contend that an interior inspection of the barn would have revealed the five (5) support columns that the Plaintiffs erected inside the barn in 1999.  Plaintiffs' argument, however, fails to acknowledge the report prepared by Garvin of Senate Engineering in August 2005, which unequivocally stated that entry into the barn should be prohibited.  Moreover, as noted by the United States Court of Appeals for the Third Circuit in Elsmere, where government officials must act quickly to avoid serious risk to public safety, "perfection or near perfection is not the standard."  Elsmere, 542 F.3d at 419-20.  Further, Plaintiffs admit that no improvements were made to the barn between April 2005 and the time it was razed in November 2005.  Plaintiffs had received several warnings or citations about the condition of the barn since 2001.  Hence, in light of the facts and circumstances facing the City officials, the court must conclude that the City's actions were neither arbitrary nor an abuse of discretion.

Next, the Court must determine whether the City of McKeesport provided an adequate postdeprivation remedy to Plaintiffs.  See Elsmere, 542 F.3d at 420.  The record reflects that

---

[5]On May 9, 1997 the City adopted the 1996 BOCA National Property Maintenance Code including those provisions involving the "imminent danger of failure or collapse of a building or structure."  See BOCA PM-109.1, BOCA PM-109.2, BOCA PM-109.4, & BOCA PM-108.1.3 (as amended).

BOCA PM-109.6 provides that any person affected by the ordering of emergency measures provided for in the Code, upon petition to the appeals board, shall be provided a hearing as set forth in the Code.  Further, the Code provides that a person having any dispute with any employee or office of the City shall request a hearing in writing by the Code Appeals Board. BOCA PM-111.2.  Clearly, the City provided an adequate postdeprivation remedy to Plaintiffs. See Elsmere, 542 F.3d at 420-23 (holding that similar provisions provided adequate postdeprivation remedy).  It is undisputed that Plaintiffs did not avail themselves of these procedures after the razing of the barn.  Hence, Plaintiffs may not now claim a constitutional violation

Plaintiffs argue that the City has a "deplorable record with regard to procedural due process" concerning whether they had an adequate postdeprivation remedy.  (Doc. No. 39 at 7.) Specifically, Plaintiffs first indicate that the City did use appropriate procedures in 2002 with regard to a garage, but that Plaintiffs successfully defended the garage on appeal to the county court of common pleas where allegedly, the City was criticized for due process violations.  The record does not substantiate this allegation nor demonstrate how due process was denied. Plaintiffs next point to their attempt to appeal the 2004 order regarding the barn, but an appeal hearing never took place.  The record is unclear as to why the hearing did not take place.  (Doc. No. 39-3 at 10-11.)  Finally, Plaintiffs refer the Court to the 2006 order from the City to clean up the debris remaining after the demolition of the barn; there, a hearing was scheduled, but Plaintiff Diede wrote to the City indicating that he could not attend.  The record reflects no particular reason as to why the hearing was not rescheduled, although House indicated generally that the City was "busy."  (Doc. No. 39-3 at 44.)  Plaintiffs suggest that the Court should

18

consider the instances where no hearing occurred in analyzing the alleged property deprivations presently before the Court.  The record is clear, however, that Plaintiffs were not entitled to a predeprivation hearing before the barn was razed.  Further, it is undisputed that Plaintiffs did not attempt to avail themselves of available postdeprivation procedures.  The record does not reflect that the postdeprivation remedies were futile or otherwise "patently inadequate."  See Alvin v. Suzuki, 227 F.3d 107, 118 (3d Cir. 2000).  Consequently, Plaintiffs cannot now complain that the City violated their Fourteenth Amendment Procedural Due Process rights with regard to the razing of the barn when they failed to invoke their available postdeprivation remedy.

Defendants' Motion for Summary judgment should be granted on this issue.


b.      1978 Mustang

Conversely, Plaintiffs have raised  issues of material fact with regard to the 1978 Mustang.  First, there is an issue of material fact as to whether the vehicle presented an emergency situation.  Defendants argue that the vehicle was leaking oil and thus a safety hazard, citing to a police report dated November 18, 2005.  (Doc. No. 38 at 12) (Doc. No. 37-12).  Yet, there appears to be no competent evidence in the record indicating that the vehicle actually presented an emergency situation for which immediate action was necessary.  In fact, the police report regarding the vehicle does not state that it posed a hazardous condition.  See Doc. No. 37-12 at 1-2.  In addition, Plaintiffs have raised an issue of fact as to whether they attempted to avail themselves of their postdeprivation remedy with regard to the vehicle.  See Doc. No. 37-2 at 19-21.  Consequently, Defendants' Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment Procedure Due Process claim regarding their 1978 Mustang should be denied.

19

2.      First Amendment Retaliation Claim

"The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment Rights."  Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274 (1977)).  A plaintiff's retaliation claim is governed by a three-part burden shifting paradigm.  Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) (citing Bd. Of County Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996)).  The three-part test has been described as follows:

> First, a plaintiff must show that his conduct was constitutionally protected.  Second, he must show that his protected activity was a substantial or motivating factor in the alleged retaliatory action.  Finally, the defendant may defeat the plaintiff's case "by showing that it would have taken the same action even in the absence of the protected conduct.

Corey v. Nassan, No. 05-114, 2006 WL 2773465, at *7 (W.D. Pa. Sept. 25, 2006) (citing Ambrose, 303 F.3d at 493) (other citations omitted).

Defendants do "not dispute that Plaintiff Huk engaged in protected activity when she spoke out at various meetings about her interest in historical preservation of certain buildings in disrepair in the City . . . ."  (Doc. No. 38 at 14).

Plaintiff Huk, however, has failed to come forward with any evidence other than her own speculations and unsupported conclusions that the City would have been motivated to retaliate against her because of her protected First Amendment activities regarding historical preservation.  Plaintiff Diede admitted that his belief that the City's actions were retaliatory is based upon his own logical conclusions.  In their Brief in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs focus their First Amendment retaliation argument on Huk's

20

objections to the demolition of the historic Penn McKee hotel at a public meeting on October 4,

2005.  (Doc. No. 39 at 8.)  Plaintiffs argue that the razing of their barn only one month later

establishes causation.  In order to establish causation here, the Plaintiffs must prove that Huk's

exercise of her First Amendment rights motivated Defendants to raze the barn and seize the

vehicle.  See Ambrose, 303 F.3d at 493.  The temporal proximity of Huk's protected speech at

the October 4, 2005 public meeting, to the alleged retaliatory act is probative, but not dispositive,

of the causation element.  Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); see also

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (stating that "temporal

proximity merely provides an evidentiary basis from which an inference can be drawn").  In

order for temporal proximity alone to establish causation, the "timing of the alleged retaliatory

action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."

Marasco, 318 F.3d at 512 (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.

1997)).  In the employment context, the United States Court of Appeals for the Third Circuit has

suggested that two days between a plaintiff's protected conduct and an employer's subsequent

retaliatory act is sufficient to establish retaliation, see Farrell v. Planters Lifesavers Co., 206 F.3d

271, 279 & n. 5 (3d Cir. 2000), but ten days is sufficient only when other evidence of an

employer's wrongdoing is presented.  Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183,

189 (3d Cir. 2003).  Consequently, temporal proximity should be measured in days, rather than

in weeks or months, to suggest causation without corroborative evidence.

Here, the one month interim between Huk's speech and the razing of the barn is not

unduly suggestive of Defendants' retaliatory motive.  The only other argument offered by

Plaintiffs concerning corroborating evidence of causation is "McKeesport's custom of depriving

Plaintiffs requested hearings and the lack of prior notice to the razing . . . ."  (Doc. No. 39 at 8-9.)  The record does not support Plaintiffs' assertion that the City had a custom of depriving Plaintiffs of requested hearings; in fact, the record reflects only one incident where the City failed to provide a hearing when requested.  (Doc. No. 39-3 at 10-11; <u>see also</u> section II. C. 1.a., <u>supra</u>, at 18-19.)  Further, as discussed at section II. C. 1. a., <u>supra</u>, the record reflects undisputed "competent evidence" of the dangerous condition of the barn and the necessity of its immediate demolition.

Plaintiffs conclude that "the razing was unjustified because there was no imminent danger beyond opinion and speculation of Christopher House and the Fire Chief."  (Doc. No. 39 at 8.)  Plaintiffs have come forward with no evidence to overcome Defendants' "showing that it would have taken the same action even in the absence of the protected conduct."  Again, as discussed at length in section II. C. 1. a., <u>supra</u>, the record reflects undisputed "competent evidence" of the dangerous condition of the barn and the necessity of its immediate demolition. Consequently, Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment retaliation claim should be granted.

3.   <u>Fourteenth Amendment Substantive Due Process Claim</u>

The United States Supreme Court has held that the Due Process clause of the Fourteenth Amendment guarantees "more than fair process."  <u>Washington v. Glucksberg</u>, 521 U.S. 702, 719 (1997).  Instead, it also consists of a substantive element "barring certain government actions regardless of the fairness of the procedures used to implement them."  <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986).

In <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998), the United States Supreme Court engaged in a thorough discussion of substantive due process.  First, the Court stated that it has emphasized repeatedly that "'[the] touchstone of due process is protection of the individual against arbitrary action of government.'"  <u>Id</u>. at 845 (quoting <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974)).  Likewise, the Court continued  that "[o]ur cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  <u>Id</u>. at 846 (quoting <u>Collins v. Harker Heights</u>, 503 U.S. 115, 129 (1992)).  In fact, the Court described the "cognizable level of executive abuse of power as that which shocks the conscience."  <u>Id</u>. at 846 (citing <u>Rochin v. California</u>, 342 U.S. 165, 172-73 (1952)).  The Court continued as follows:

> [T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.  It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way <u>unjustifiable by any government interest</u> is the sort of official action most likely to rise to the conscience-shocking level.

<u>Lewis</u>, 523 U.S. at 848-49 (citations omitted) (emphasis added).

Here, Plaintiffs have come forward with no evidence from which a rational juror could find for them on the issue of substantive due process.  The specific circumstances of this case demonstrate that the behavior of the Defendants does not shock the conscience.  Undisputed facts of record reflect that Defendants reacted to concerns for public safety, a justifiable government interest.  Hence, Defendants' Motion for Summary Judgment on Plaintiffs' Fourteenth Amendment Substantive Due Process claim should be granted.

    4.    <u>Conspiracy, McKeesport Police Department as Proper Defendant,</u>

<u>Fifth Amendment Taking, and Punitive Damages Claims</u>

Summary judgment will be granted as to all of these claims in that Plaintiffs do not contest their dismissal as a matter of law.

## III.    <u>CONCLUSION</u>

It is respectfully recommended that Defendants' Motion for Summary Judgment at Doc. No. 35 be denied in part and granted in part.  It should be denied as it relates to Plaintiffs' Fourteenth Amendment Procedural Due Process claim regarding the removal of their vehicle.  In all other respects, Defendants' Motion for Summary Judgment should be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

 

LISA PUPO LENIHAN
United States Magistrate Judge

Dated: August 19, 2009

cc: The Honorable Gary L. Lancaster

All counsel of record